**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

BARBARA ANN COULBOURNE,

                    Plaintiff,

v.                                      ACTION NO. 2:13cv97

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff Barbara Ann Coulbourne ("Ms. Coulbourne" or "Plaintiff") brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI")  pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be AFFIRMED.

**I. PROCEDURAL BACKGROUND**

Plaintiff protectively applied for DIB and SSI on January 13, 2011, alleging disability

since July 16, 2008,[1] caused by breast cancer in remission, anxiety attacks, and stress. R. 229-32, 253.[2]  Plaintiff's applications were denied initially and on reconsideration. R. 153-58, 164-70. Plaintiff requested a hearing by an Administrative Law Judge (ALJ), which occurred on August 16, 2012. R. 40-68.  Plaintiff, represented by counsel, testified before the ALJ, along with a vocational expert. R. 40-68.

On September 11, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. R. 18-31.  The Appeals Council denied Plaintiff's request for administrative review of the ALJ's decision. R. 1-4. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Plaintiff timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g).  On December 12, 2013, Plaintiff moved for summary judgment reversing the ALJ's finding that Plaintiff was not disabled and awarding benefits. ECF No. 12.  In the alternative, Plaintiff requested remanding the case to the ALJ for further proceedings.  ECF No. 13.  On January 15, 2014, Defendant filed a cross-motion for summary judgment affirming the decision of the Commissioner that Plaintiff was not disabled under the Act. ECF No. 15. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for a decision based on the memoranda.

## II. FACTUAL BACKGROUND

Born on September 21, 1964, Plaintiff was forty-six years old on the amended alleged

---

[1] Plaintiff previously filed applications for SSI and DIB, alleging an onset date of September 15, 2008, which were denied by an ALJ on December 17, 2010. R. 69-87.  The ALJ in this case considered the decision of the first ALJ to have res judicata effect, and only considered the period after December 17, 2010.  R. 21.  Though the ALJ mistakenly stated that Plaintiff's previous application was not appealed (her previous application's appeal is cited as *Coulborne v. Colvin*, 2:12cv344 (E.D. Va. Dec. 20, 2013)), the ALJ's opinion should still be treated with res judicata effect because the District Court affirmed the Commissioner's decision, and Plaintiff did not appeal that decision to the Fourth Circuit.  *Id.*

[2] The citations in this Report and Recommendation are to the Administrative Record.

onset date of September 18, 2010, and was almost forty-eight at the time of her administrative hearing and the ALJ's decision.  R. 30, 43.  Plaintiff finished the seventh grade, and has past relevant work as a cook's helper and as a companion.  R. 30, 57-58.

### A.    Medical Background

Plaintiff was diagnosed with breast cancer in 2008, and underwent treatment, including a modified radical mastectomy, reconstruction, chemotherapy, and radiation, which was completed in June of 2009.[3]  R. 418, 479-80, 504, 804.  On August 25, 2009, Plaintiff presented to a pain management specialist, Brent R. Fox, M.D., of Delmarva Pain Associates, LLC, complaining of back and leg pain.  R. 550.  Dr. Fox found no significant findings in his examination of Plaintiff, but diagnosed her with polyneuropathy secondary to chemotherapy and prescribed Savella, Oxycodone, Gabapentin, and a Fentanyl patch, along with a low-impact exercise program.  R. 550.  Plaintiff continued to present for regular medication management appointments through September 7, 2011.  R. 338-45, 656-67.  Dr. Fox's examinations generally showed that Plaintiff had normal gait and sensation, normal alignment and range of motion of her cervical spine, and she was in no acute distress.  R. 338-45, 656-67.  Throughout the course of treating Plaintiff, Dr. Fox prescribed Oxycodone, Morphine Sulphate, Klonopin, MS Contin, Methadone, and Fentanyl patches.  R. 338-45, 656-67.

On June 2, 2011, Plaintiff was examined by David Kemp, M.D., of White Stone Family Practice.[4]  R. 531, 899.  Dr. Kemp indicated that Plaintiff had chronic pain syndrome possibly residual to her cancer treatments, and at that appointment complained of pain under her right scapula.  R. 531, 899.  He also opined that she appeared to be "significantly depressed

---

[3] Since then, Plaintiff appears to be cancer-free; a biopsy was taken on February 24, 2011, but the result was negative for malignancy, and clinical notes from Plaintiff's oncologist show no further evidence of breast cancer.  R. 320-23, 536, 713-14, 721, 804.
[4] Dr. Kemp was assisted by Elizabeth Inez Pruitt, PA-C, throughout.

throughout the encounter," but had found many antidepressant drugs to be "unacceptable due to side effects." R. 531, 899. He noted that Plaintiff was receiving "large doses of opiates" from her pain management specialist. R. 531, 899. Plaintiff's physical examination was unremarkable, except for a "tenderness to direct palpitation" over Plaintiff's right scapula and rhomboid. R. 532, 900. Dr. Kemp recommended a bone scan, which showed mild scoliosis of the thoracolumbar spine and increased activity involving Plaintiff's shoulder, hip, knee, ankle, elbow and wrist joints bilaterally, with some associated mild degenerative changes. R. 532, 535, 900.

Plaintiff continued to attend regular physical examinations with Dr. Kemp and Physician's Assistant Pruitt, along with Keith Cubbage, M.D., all of White Stone Family Practice. R. 612-36. The examinations showed normal gait and station, good range of motion, and no acute distress. R. 613, 615-16, 622, 625, 628, 631, 634, 636. Plaintiff did show some signs of depressive symptoms and panic attacks, which Dr. Kemp attempted to treat. R. 612-636. Panic attacks were first assessed on July 5, 2011, and Physician's Assistant Pruitt also assessed Plaintiff's depression as deteriorated. R. 634, 893. However, she denied memory loss, mental disturbance, suicidal ideation, hallucinations, and paranoia. R. 633, 892. On July 7, 2011, Dr. Kemp assessed Plaintiff's panic attacks as deteriorated. R. 631, 890. However, on July 13, Physician's Assistant Pruitt stated that Plaintiff's mood and affect were appropriate. R. 628, 887. On August 25, 2011, Dr. Kemp noted that Plaintiff's affect is "one of depression." R. 612, 871. He stated that Plaintiff had been "leary" of antidepressant medication, but that he and Physician's Assistant Pruitt convinced Plaintiff to try Abilify. R. 612-13, 871-72.

On July 27, 2011, Plaintiff was evaluated by Robin J. Lewis, Ph.D., for the Virginia Department of Rehabilitative Services. R. 607-11. Dr. Lewis noted that Plaintiff complained of

depression and panic attacks, and problems sitting and standing.  R. 607.  Plaintiff also stated that she did not have problems with depression or panic attacks before her breast cancer diagnosis and treatment, and that she dislikes antidepressant medications because they make her "mean" and increase her mood swings.  R. 608.  Dr. Lewis stated that Plaintiff and her husband were both out of work, and that they were concerned about their financial and living situation. R. 608.  Plaintiff also did not do activities she used to enjoy, like boating and seeing friends, and did not do housework or cook.  R. 608.  Plaintiff's adult son had recurrent legal troubles.  R. 608. Plaintiff also denied both smoking and drinking to Dr. Lewis, but upon further questioning admitted she still did both, but had not been drinking as much lately because she could not afford it.  R. 608.

Dr. Lewis's examination revealed that Plaintiff was in obvious discomfort and distress. R. 609.  Plaintiff reported dysphoria, had little appetite, and had poor sleep.  R. 609.  Plaintiff admitted to thinking about suicide, but stated that she did not have an active plan to do so.  R. 609.  She worried about her husband and his health and safety, because he was her primary caretaker, and she worried especially when he left for periods of time.  R. 609.  She had difficulty with cognitive processing, like counting backwards by single digits, doing basic math, and spelling a simple word backwards.  R. 609.  Dr. Lewis assessed Plaintiff's psychological insight and judgment as fair, despite her extreme fatigue and forgetfulness. R. 609.  Dr. Lewis also discussed Plaintiff's tearfulness and worries about her health, her pain, and her financial situation.  R. 609.  Dr. Lewis described Plaintiff's fund of information as "quite low" and her intellectual functioning as "below average," citing Plaintiff's lack of knowledge of current events, or the state capital of Virginia.  R. 609-10.  Dr. Lewis assessed Plaintiff as suffering from severe depression with vegetative signs such as fatigue, poor sleep and appetite, low energy, and

loss of libido.  R. 610.  Dr. Lewis diagnosed Plaintiff with major depressive disorder, severe,[5] with a current GAF of 35-40.  R. 610.  Dr. Lewis also assessed Plaintiff and her husband's credibility, stating that they "seemed to provide accurate information consistent with medical records and consistent with presentation."  R. 610.   Dr. Lewis indicated that, as of the evaluation, Plaintiff "would be unable to do detailed and complex tasks," and that "[e]ven simple and repetitive tasks would be a challenge given her poor concentration, limited intellect and chronic pain."  R. 611.  Dr. Lewis also stated that Plaintiff's attendance and consistency would be poor, and she would be unlikely to do anything without additional supervision or support.  R. 611.  Plaintiff also might have difficulties following direction, interacting with others, or dealing with stress.  R. 611.

Plaintiff continued to see Dr. Kemp for follow-up appointments.  R. 812-70.  On December 29, 2011, Dr. Kemp noted that Dr. Fox, Plaintiff's pain management specialist, had "lost his ability to prescribe controlled drugs."  R. 723, 858.  He expressed concern that Plaintiff might go through withdrawal from opiates and encouraged Plaintiff to seek inpatient detoxification.  R. 723-24, 858-59.  Plaintiff declined, and chose to do so at home.  R. 724, 726.  However, on January 2, 2012, Plaintiff presented to Riverside Shore Memorial Hospital for opiate withdrawal.  R. 755-58.  She was discharged on January 4, 2012, in stable condition and with discharge diagnoses of opiate withdrawal, narcotic dependence, chronic pain, nausea, and diarrhea.  R. 759-61, 809-11.  Plaintiff returned to see Dr. Kemp on January 12, 2012.  R. 727-28, 855-57.  He reported that she was no longer taking narcotic pain medication, but was taking "very large doses" of gabapentin and tramadol for her pain.  R. 727.

---

[5] In different places in the report, Plaintiff's major depressive disorder is stated as with psychotic features and without psychotic features; it is unclear from the context which is the intended diagnosis.  R. 610.

On February 23, 2012, Plaintiff underwent surgical revision of her scar tissue from her breast reconstruction.  R. 738-44, 936-51.  After the surgery she was placed on narcotic pain killers again.  R. 736.  On March 9, 2012, a follow-up report post-surgery indicated that Plaintiff was "off most of her analgesic[]" medication, and that she was "perhaps" experiencing some withdrawal symptoms.  R. 745.  Plaintiff saw Dr. Cubbage on March 14, 2012, and requested that she be able to continue on the narcotic medication.  R. 749.  Dr. Cubbage declined to refill Plaintiff's narcotics prescriptions, citing her past history with narcotics and his belief that her achiness is from minor withdrawal.  R. 751.

On March 27, 2012, Plaintiff was admitted to Penninsula Regional Medical Center after a suicidal overdose on medication.  R. 765.  Plaintiff claimed that she "had not been given enough oxycodone following the surgery," and admitted to having purchased a pill of oxycodone off the street "about a day before her overdose."  R. 767.  Plaintiff also discussed her history of bad reactions to antidepressant medications, and admitted that, as a teenager, she cut herself and had suicidal thoughts.  R. 767.  Plaintiff denied suicidal and homicidal ideations during an examination, and was given a GAF of 25 at her initial examination on March 27, 2012.  Plaintiff was placed on opiate withdrawal protocol and benzotriazapine withdrawal protocol, and was started on Celexa and trazodone.  R. 768.  Plaintiff was discharged on April 3, 2012, at which time she denied suicidal or homicidal ideations.  R. 765.  She was diagnosed with major depressive disorder, moderate; opioid dependence; and continuous alcohol dependence, episodic for Axis I, borderline personality disorder for Axis II, and a GAF score of 65 on discharge.  R. 765.

After her release, Plaintiff followed up with Dr. Kemp at regular intervals, with records starting on April 19, 2012.  R. 822-38.  On May 4, 2012, Dr. Kemp noted that he was at a loss as

to Plaintiff's treatment, stating that, despite the previous detoxification, Plaintiff was "worse off than ever." R. 825. He opined her pain was likely partially due to depression, but that he was reluctant to try antipsychotic drugs. R. 825. On May 17, 2012, Dr. Kemp noted that she was seen riding her bicycle around that time, which he considered to be a good sign. R. 822. On June 14, 2012, Dr. Kemp noticed a patch on Plaintiff's left thigh, which she claimed was a cigarette deterrent. R. 812. Dr. Kemp noted that he was suspicious that it was instead a Fentanyl patch, and also stated that Plaintiff admitted to taking the occasional Percocet, which she purchased "off the street." R. 812-13. Dr. Kemp's treatment notes indicated that he was "very concerned that the number and varieties of medications [Plaintiff] uses exceeds what [he has] prescribed." R. 813.

On July 6, 2012, Dr. Kemp filled out a Post Cancer Treatment Medical Source Statement. R. 951-54. In it, he described Plaintiff's prognosis as "guarded," stating that she had a chronic burning pain on the site of her breast reconstruction. R. 951. He indicated that she could occasionally lift twenty pounds and stoop, crouch/squat, and climb stairs, but that she could rarely twist and never climb ladders. R. 952. He also noted that Plaintiff could reach in front of her body or overhead for only ten percent of an eight-hour workday, and that she was likely to be off-task for twenty-five percent of a workday or more. R. 952. He indicated she could walk four city blocks without stopping, could sit for more than two hours at a time, but could only stand for thirty minutes at a time. R. 953. He also marked that in an eight-hour workday, Plaintiff could stand/walk for less than two hours, and sit for approximately four hours. R. 953. He indicated that Plaintiff could not work an eight-hour workday, and estimated that she would only be able to work approximately ten hours per week. R. 953. Dr. Kemp also noted that Plaintiff would need the ability to shift positions between sitting, standing and walking at will, and that she would

need more than ten unscheduled breaks during the workday that could last approximately thirty minutes.  R. 953.  He indicated that she was incapable of even "low stress" work, and that she would likely need to be absent from work more than four days per month.  R. 954.

On July 27, 2012, Plaintiff was admitted to Tangier Health Center "under the auspices of a temporary detaining order obtained from the Accomack courts," for leaving a voicemail on her husband's phone in which she threatened to kill herself.  R. 969.  Plaintiff apparently denied the use of alcohol, drugs, or abusing over-the-counter medication.  R. 969-970.  She was diagnosed with major depressive disorder, recurrent, without psychosis, severe, and given a GAF score of 35.  The record contains no discharge orders, but the admission paperwork indicated Plaintiff would need to stay for an estimated three days.  R. 971.

### B.      Function Reports

Plaintiff filed two function reports with her applications.  The first was filed on June 1, 2011.  R. 259-66.  Plaintiff began by explaining that everyday activities were difficult because of her pain, and that she was having difficulty managing that pain.  R. 259.  She noted it was painful for her to dress, bathe, care for her hair, and feed herself, and also stated that sometimes she did not make it to the bathroom because she had difficulty walking.  R. 260.  She prepared meals daily when she had the energy, but the food was usually sandwiches or frozen dinners; Plaintiff used to cook large meals, but claimed her cancer treatments damaged her so that she could not any longer.  R. 261.  She stated she did not do any yard work, and only did occasional and light chores around the house, such as dusting and small laundry.  R. 261.  She opined that she did not go outside much, and had her groceries delivered.  R. 262.  She did not drive, but did indicate that she drove a golf cart.  She claimed she was able to pay bills, count change, and use

a checkbook, but that she could not handle a savings account because she did not have one.  R. 262.  She stated that she makes more mistakes in her handling of money since her onset.  R. 263.

Plaintiff stated that for fun, she watched television and tried to read, but no longer did the things she loved to do, like fishing, boating, and keeping house.  R. 263.  She also noted that she did not attend social events because it was too painful, and only went out to doctor's appointments.  R. 263.  She checked boxes to indicate that her condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember things, complete tasks, concentrate, understand, and follow instructions.  R. 264.  She stated that she could only pay attention for short periods of time, she did not finish what she started, she did not follow written instructions well, and she only followed spoken instructions a "little better."  R. 264.  She also indicated that she handled stress and changes in routine very poorly, and that she feared losing her home.  R. 265.  She also noted that she wore a brace "all the time," though she did not sleep in it.  R. 265.

Plaintiff filed a second function report on September 16, 2011.  R. 276-83.  In it, she indicated that she could no longer do yardwork, cook, or do housework because of her condition, and that she woke up every two hours with joint and muscle pain.  R. 277.  She stated that she dressed slowly, she had a rail in her tub to keep her from falling while bathing, and she had to shampoo her hair and feed herself with her left hand.  R. 277.  She noted that she no longer had much of an appetite, and that she required encouragement for cooking and cleaning.  R. 278.  She repeated that she did not go out except to doctor's appointments, and that she did not drive because there were no cars on Tangier Island, where she lives.  R. 279.  She indicated that she could not pay bills, count change, manage a savings account or use a checkbook because she could not concentrate and made too many mistakes.  R. 279.  She also reiterated that she only

watched television as a hobby, and stated that she had difficulty remembering what had happened because she was forgetful. R. 280. She indicated that she had difficulty getting along with friends and family because she was "in so much pain" that she was not very friendly. R. 281. She also checked boxes to indicate that her condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, remember things, complete tasks, concentrate, understand, use her hands, and get along with others. R. 281. She also indicated that she could only lift five pounds, and could walk for up to ten minutes. R. 281. She reiterated her difficulties in following written and spoken directions, and her inability to handle stress or changes in routine, and stated that she had "fears of being alone." R. 282.

Plaintiff's daughter-in-law, Lorraine Landon, also filled out a function report on September 27, 2011. R. 284-93. She indicated that Plaintiff used to be able to work and take care of her house, including yard work, but could not any longer, because of her condition. R. 286. Ms. Landon stated that Plaintiff took a long time to get dressed and was very slow to bathe, and did not do anything to her hair but wash it. R. 286. Ms. Landon indicated that Plaintiff could no longer cook, though she used to cook every day, and the only chore she did regularly was laundry, twice a week. R. 287. Plaintiff went outside twice a week for fifteen to twenty minutes, and was not strong enough to do more. R. 288. Ms. Landon confirmed that Plaintiff ordered her groceries in and had them delivered, and stated that Plaintiff shopped additionally at a small store on Tangier Island, but only for fifteen minutes, once a week. R. 289.

Ms. Landon also indicated that Plaintiff could not pay bills, handle a savings account, or use a checkbook because she made a lot of mistakes. R. 289. She also confirmed that Plaintiff's hobbies were mainly watching television, and that she had difficulty remembering what happened in a television show. R. 289. As to Plaintiff's social activities, Ms. Landon indicated

11

that Plaintiff did no social activities whatsoever, and had difficulty getting along with friends and family.  R. 290.  Ms. Landon circled places on the form to indicate that Plaintiff's condition affects her ability to lift, stand, walk, sit, climb stairs, kneel, squat, reach, use her hands, bend, see, remember things, concentrate, talk, complete tasks, understand, follow instructions, and get along with others.  R. 290.  Ms. Landon also indicated that Plaintiff could only walk for ten minutes, and then required a ten minute rest.  R. 291.  Ms. Landon also noted that Plaintiff had difficulty paying attention and forgot what she was told, did not like following written instructions and had to read the instructions multiple times, and rated her ability to follow spoken instructions as "fair."  R. 291.  Ms. Landon stated that Plaintiff did not get along very well with authority figures, poorly handled changes in routine, and in response to a question as to how Plaintiff handled stress, Ms. Landon answered "she doesn't."  R. 291-92.  Ms. Landon indicated that Plaintiff was afraid of being homeless, and feared dying and being alone.  R. 292.

### C.      The Administrative Hearing – August 16, 2012

Plaintiff testified that she went to school through the seventh grade, and attended some special classes, though she could not recall in which subjects.  R. 43.  She testified that she left school to take care of her ailing mother, and her last work was in a restaurant in 2006 as an assistant cook.  R. 43-44.  She indicated that her primary care doctor was Dr. Kemp of Riverside Tangier Health Center, and that he treated her mainly for depression and pain.  R. 44.  She also noted that Dr. Fox, her pain management specialist, "got in trouble," and she stopped seeing him. R. 45.  After she stopped seeing Dr. Fox, Dr. Kemp sent her to detox for narcotic drugs, and started her on non-narcotic drugs.  R. 45.  Plaintiff indicated that her pain was located on her back, her right breast, her legs and her knees, with the worst pain in her breast and back.  R. 46. She also noted that she had a scar revision surgery done on her right breast, and since then her

right arm has been weak to the point where she cannot lift a gallon of milk with it.  R. 46.

Plaintiff discussed her two psychiatric admissions, beginning with her overdose on pills. R. 47.  She stated that she had drunk alcohol in order to try to sleep, and did not remember taking the eighty pills on which she overdosed.  R. 47.  For the second hospitalization, Plaintiff stated that she and her husband "had a little spat" and he left, and she tried to call him.  R. 47-48. When he did not answer, she "felt so alone, like nobody didn't care about [her]," and she had the urge to kill herself.  R. 48.  She stated that she was still depressed, and when she was depressed she thought about killing herself and cried a lot.  R. 48.  She also stated that her depression affected her motivation and energy levels, and made it difficult for her to concentrate.  R. 48. She opined that she was forgetful, did not get out of the house much, and had difficulty keeping a daily routine.  R. 49.  She stated that she had little social interaction outside of doctor's visits because of her pain and depression, and that once a month she would go to see her sister-in-law. R. 50.

In response to questioning from the ALJ, Plaintiff noted that she and her husband had no income, and survived day-to-day on charity from her church and a woman from Tangier Health Center.  R. 51.  Her husband did not work because of a herniated disc and shoulder pain, but he was denied social security benefits.  R. 51-52.  Plaintiff stated that she did not reinjure herself since the date of the ALJ's decision on her previous application, but that she felt her symptoms had gotten worse since that time.  R. 52.  She also stated that she had not seen a psychiatrist, but was scheduled to do so that month.  R. 52.  She also indicated that she had quit drinking since her second psychiatric hospitalization.  R. 53.

Plaintiff stated that she had difficulty lifting, standing, walking and sitting, and could only stand for ten minutes before the pain in her back and legs was too much.  R. 53-54.  She

testified that she could walk five minutes, or approximately a block, and could sit "until [she had] to get up to use the bathroom." R. 54. She also testified that her fingers got numb occasionally, and she could not lift a gallon of milk without pain. R. 54. Plaintiff also again discussed her two recent hospitalizations for severe depression. R. 55-56.

A vocational expert ("VE") testified that Plaintiff's past work as a cook's helper was medium in exertion, and her work as a companion was semi-skilled and light in exertion. R. 58. The ALJ asked whether jobs would be available for a hypothetical person with the same age, education and work experience as Plaintiff who would be moderately limited in her ability to perform ADLs and interact socially and who would be moderately limited in her ability to maintain concentration persistence and pace due to pain and depression and anxiety one-third of the workday and as a result would require simple, routine, unskilled jobs of an SVP of 1 or 2, meaning low stress, low concentration, low memory, and which require one to two steps and no production rate piece work; that have little decision-making or changes in the workplace setting or judgment to perform the work; that have little interaction with the public, coworkers, or supervisors; that would allow her to deal with things rather than people; and that would require her to lift ten pounds frequently, twenty on occasion, and require her to stand for an hour and sit for an hour consistently on an alternate basis or at-will, and would "avoid heights, hazardous machinery, climbing stairs, or course, temperature, humidity extremes, [and] hazardous machinery . . . ." R. 59. The VE testified the jobs of light, unskilled sorter, unskilled final assembler, and unskilled finisher would be available for such a person. R. 60-61. Plaintiff's attorney questioned the VE, first asking the VE to clarify her interpretation of the ALJ's hypothetical requirements of "moderate limitations on concentration, persistence and pace," and "no production-paced work." R. 62. The VE testified that she interpreted the first as not

precluding simple, unskilled work, and the second as requiring an individual to be productive eighty percent of the time, but not at a consistent, conveyer-belt pace.  R. 62.  Plaintiff's attorney then asked if a "moderate limitation" in concentration, persistence and pace one-third of the time would preclude Plaintiff from the eighty percent productivity the VE discussed above.  R. 63. The VE testified that if "moderate limitation" was interpreted to mean that an individual would be off-task for one-third of the time, it "would not be consistent with competitive employment," but that based on the definition of "moderate" the ALJ provided, the VE's interpretation of "moderate" limitations was consistent with her recommendations.  R. 63.  Plaintiff's attorney then posed a hypothetical regarding a person of the same age, education level, and past relevant work history that would be able to perform at the light exertional level, but would have no useful ability to deal with work stresses, little to no ability to follow work directions and interact with others, no ability to do simple work tasks without additional supervision and support, and difficulty maintaining regular attendance.  R. 64.  The VE testified that in that hypothetical, there were no jobs in the national economy for that individual.  R. 64.  Plaintiff's attorney also clarified with the VE that unscheduled absences can affect one's ability to be employable, and that if an individual missed twelve to fifteen days per year from work, they could not maintain regular employment.  R. 65.

### D.      The ALJ's Decision – September 11, 2012

The ALJ found Plaintiff had not been disabled, as defined by the Social Security Act, from December 18, 2010, through the date of the decision.  R. 21, 31.  Plaintiff met the insured status requirement through December 31, 2011.  R. 23.  At step one of the five-step analysis, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since December 18, 2010, the amended alleged onset date.  R. 23.  At step two, the ALJ found that Plaintiff's status-

post effects of breast cancer in remission, degenerative disc disease, chronic pain syndrome, depression, and anxiety were severe impairments. R. 23. At the third step, the ALJ concluded Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 24-25.

The ALJ found Plaintiff had the residual functional capacity (RFC) to perform light work, "except limited to simple, routine, unskilled jobs, SVP 1-2; low stress, low concentration and low memory, meaning jobs involving 1-2 step tasks, no production rate pace work, little decision making or changes in the work setting or judgment to perform the work; little interaction with the public, supervisors, or co-workers; dealing with things rather than people; can stand for one hour and sit for one hour, consistently on an alternate basis, or at will; and should avoid heights, hazardous machinery, humidity, temperature extremes and stair climbing." R. 25. The ALJ summarized the medical evidence for both Plaintiff's physical and mental treatment history. R. 25-28. He stated that there was little evidence of Plaintiff's physical worsening, and that he considered Plaintiff's mental health symptoms when assigning unskilled work with limited social contact. R. 28. He also indicated that he gave Plaintiff the sit/stand option in response to her reports of pain. R. 28. The ALJ assigned little weight to Dr. Lewis's consultative opinion, citing a dearth of mental health records for Dr. Lewis to consider in his assessment and that he believed the medical evidence did not support Dr. Lewis's assessment at the time. R. 29. He also discussed Dr. Kemp's opinion, stating that Dr. Kemp did not begin treating Plaintiff until after her breast cancer, his determination of disability is a decision left up to the Commissioner, and Dr. Kemp's report is largely based on Plaintiff's subjective complaints, though the ALJ did not specifically assign any weight to Dr. Kemp's opinion. R. 29. He also found Plaintiff's subjective complaints to be "not fully persuasive." R. 29.

16

Accordingly, the ALJ found Plaintiff was not capable of performing any of her past relevant work at step four.  R. 30.  The ALJ found at step five that, with Plaintiff's age, education, and residual functional capacity, there were jobs that exist in the national economy she could perform, such as sorter, final assembler, and finisher.  R. 30-31.

Plaintiff argues (1) the ALJ did not give proper weight to the opinion of Plaintiff's treating physician; and (2) the ALJ's hypothetical did not accurately describe all of Plaintiff's work-related limitations. Pl.'s Mem. 7-10, ECF No. 14.  The undersigned disagrees, finding there is substantial evidence in the record to support the ALJ's decision, and recommending that the decision of the Commissioner be AFFIRMED.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether

the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

### A. Substantial Evidence in the Record Supports the ALJ's RFC Assessment

Plaintiff argues the ALJ's RFC assessment is not based on substantial evidence because the ALJ did not assign weight to the opinion of Plaintiff's treating physician, Dr. Kemp; and because in his analysis of both Dr. Kemp's and Dr. Lewis's opinions, the ALJ engaged in "result-oriented decision making." Pl.'s Mem. 7-9. The undersigned finds there is substantial evidence to support the ALJ's RFC assessment.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. §§ 404.1545(a). The RFC is a claimant's maximum ability to work despite his limitations. *Id.* at 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1545(a)(3).[6]

In making the RFC determination, the ALJ must consider the objective medical evidence

---

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

in the record, including the medical opinions.   Under the applicable regulations, the ALJ is

required to explain in his decision the weight assigned to *all* opinions, including treating sources,

non-treating sources, State agency consultants, and other nonexamining sources.   20 C.F.R.

§ 416.927(e)(2)(ii).   Therefore, when the ALJ's decision is not fully favorable to the claimant,

the decision must contain

> specific reasons for the weight given to the treating source's
> medical opinion, supported by the evidence in the case record, and
> must be sufficiently specific to make clear to subsequent reviewers
> the weight the adjudicator gave to the treating source's medical
> opinion and the reasons for that weight.

SSR 96-2, 1996 WL 374188, at *5 (S.S.A.).   This specificity requirement is necessary because

the reviewing court

> face[s] a difficult task in applying the substantial evidence test
> when the [Commissioner] has not considered all relevant evidence.
> Unless the [Commissioner] has analyzed all evidence and has
> sufficiently explained the weight he has given to obviously
> probative exhibits, to say that his decision is supported by
> substantial evidence approaches an abdication of the court's 'duty
> to scrutinize the records as a whole to determine whether the
> conclusions reached are rational.'

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974)).

In making the RFC determination, the ALJ must especially consider the medical opinions

of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating

physician's opinion merits "controlling weight" if the opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in the record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Conversely, "if

[a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other

substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

However, a finding that a treating physician's opinion is not well-supported by medically acceptable clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. SSR 96-2, 1996 WL 374188, at *4 (S.S.A.).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Though the ALJ in this case did not assign a specific weight to Dr. Kemp's opinion, it is clear he intended to distinguish Dr. Kemp's opinion from his ultimate disability determination. The ALJ walked through the steps necessary to discount Dr. Kemp's opinion, and also properly weighed the factors provided in the regulations in order to justify a lesser weight. R. 29. In order for the ALJ to discount a treating physician's opinion and not give it controlling weight, he must demonstrate that Dr. Kemp's opinion was not well-supported by medically acceptable diagnostic techniques, or that it was inconsistent with the record. The ALJ stated that Dr. Kemp cited "no objective medical testing or clinical correction to support" the limitations he assessed for Plaintiff, instead relying on subjectively reported symptoms, and that his own treatment records did not support the limitations he assessed for Plaintiff. R. 29. Through this, the ALJ made clear that he did not believe that either factor was met. Both of these factors must be examined in order for the ALJ to discount a treating physician's opinion and not give it

controlling weight, and the ALJ found both factors to be discounted here. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)

The ALJ also walked through the factors he is required to weigh when considering weight given to any medical opinion. R. 29. He discussed Dr. Kemp's treatment relationship with Plaintiff, citing that even though he is her primary care physician, he was not treating her during her breast cancer treatment. R. 29. That corresponds with a discussion of the length, nature, and extent of their treatment relationship, factors to be addressed when deciding how to assign weight. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). This, plus the ALJ's discussion of Dr. Kemp's lack of objective medical testing, reliance on Plaintiff's subjective complaints, and inconsistency in the record, all address the additional factors of degree of supporting explanations and consistency with the record. *Id.* It is clear from the ALJ's discussion that he intended to discount Dr. Kemp's opinion, at least to some degree.

The ALJ's failure to specifically assign weight to Dr. Kemp's opinion, in light of his thorough and detailed discussion discounting Dr. Kemp's reasoning, is harmless error. *See Stanley v. Comm'r, Soc. Sec. Admin.*, No. SAG-11-671, 2013 WL 2455984, *3 (D. Md. June 4, 2013) ("Despite her failure to specifically assign weight to [a physician's] opinion, the ALJ's decision impliedly demonstrates that she determined that his opinion warranted lesser weight . . . . In light of that substantial evidence inconsistent with [the physician's] opinion and the ALJ's discussion of [the physician's] findings and treatment records, remand is unwarranted only on the basis of the ALJ's failure to explicitly state the weight given to the opinion."); *see also Morgan v. Barnhart*, 142 F. App'x 716, 721 (4th Cir. Aug. 5, 2005) (finding if ALJ's rejection of doctor's opinion was error, it was harmless error). In this case, the ALJ discussed all factors necessary to weigh Dr. Kemp's opinion, and in doing so, clearly indicated that he intended to

22

discount its weight.  It would be a waste of resources to remand this case simply so the ALJ could state what has already been clearly indicated by his discussion.  *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").  Because of this, the undersigned will not remand the case to correct such a small offense.

The Court also finds there is substantial evidence to support the ALJ's opinion, and that the ALJ did not err by engaging in "result-oriented decision making."  Pl.'s Mem. 8-9.  Plaintiff claims that the ALJ erred by not citing specific medical records to support his decision to discount Dr. Kemp's and Dr. Lewis's opinions on the grounds that they are inconsistent with the record as a whole, and that the ALJ's arguments were conclusory.  *Id*.  The undersigned disagrees.  The ALJ walked through the steps required by the regulations, and cited substantial evidence for his conclusions.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

In the ALJ's analysis of Dr. Kemp's opinion, he discusses how his opinion is inconsistent with the treatment record.  R. 29.  While the ALJ does not cite specific medical records, he does cite with specificity that Dr. Kemp's treatment records "do not support the assessed limitations as he continuously notes a normal gait and station, there is no evidence of disease recurrence, mild objective testing results, and she continues unauthorized narcotic use."  R. 29.  This is a genuine assessment of how the medical records Dr. Kemp kept throughout his treatment of Plaintiff compare with his opinion evidence.  Additionally, though the ALJ does not cite to specific medical records in his analysis in that specific paragraph, he spent the previous four pages discussing the medical record in detail; it is apparent from this that the ALJ took into

23

account specific medical records when making his decision.  R. 25-28.  Furthermore, the ALJ's analysis that ultimately discounted Dr. Kemp's opinion did not rely solely on its discrepancy from treatment notes; as stated above, the ALJ also discounted Dr. Kemp's opinion based on the length, nature and extent of their treating relationship, lack of objective medical testing, and reliance on the Plaintiff's subjective complaints for his analysis.  R. 29.  The ALJ walked through the proper steps to discount Dr. Kemp's opinion, and discounted the opinion based on legitimate reasons as stated by the Social Security Administration.

The ALJ also walked through the proper analysis when discounting Dr. Lewis's opinion, and did not engage in "result-oriented decision making."  Pl.'s Mem. 8-9.  The ALJ rightly points out that, at the time of Dr. Lewis's analysis, there was no evidence in the record of Plaintiff seeking mental health care. R. 29.  Prior to Plaintiff's assessment with Dr. Lewis, Plaintiff's only other medical treatment notes that discussed her mental health were those of her primary care physician, who simply noted that she was showing signs of depression and panic attacks, that appeared to be worsening over time, but that she had appropriate mood and affect. R. 628-34, 887-93.  Additionally, the ALJ also pointed out that Plaintiff was not taking any mental health medication, nor had she sought prior medical treatment.  R. 29.  He also made note that Plaintiff's hospitalizations for mental health occurred after Dr. Lewis's evaluation, and were directly tied to alcohol and opiate dependence.  R. 29.  The undersigned finds that based on Plaintiff's conservative course of treatment and her lack of mental health-related medical records prior to her consultation with Dr. Lewis, there is substantial evidence that the ALJ properly discounted Dr. Lewis's opinion.

**B.   The ALJ's Hypothetical to the Vocational Expert was Not Legally Insufficient**

Plaintiff next claims that the ALJ's hypothetical question posed to the VE was

insufficient, and that the ALJ's RFC failed to address Plaintiff's alleged inability to remain on task during an eight-hour day and unreliability, which may contribute to extended unexcused absences. Pl.'s Mem. 9-10. The Court will look to each in turn.

First, there is substantial evidence that the ALJ properly discounted Plaintiff's claims that she would be unable to remain on task for a full eight-hour workday and that she may be absent for extended periods due to her limitations. In his discussion of Plaintiff's RFC, the ALJ determined that Plaintiff's full mental limitations alleged were not supported by substantial evidence. R. 28. The ALJ discussed how Plaintiff's only current mental health treatment is by her primary care physician, and that Plaintiff's two hospitalizations for mental health treatment were both tied to alcohol and "possible withdrawal from narcotics." R. 28. He also noted that Plaintiff had purchased and used narcotics from "off the streets," which may have led to her first hospitalization for an overdose on pills. R. 28. Despite Plaintiff's "lack of consistent mental health treatment," the ALJ considered Plaintiff's "reports of depression and anxiety symptoms and pain in assigning unskilled work with limited social contacts." R. 28. He also considered her claims of pain when assigning work at the light exertional level and including that Plaintiff should be able to sit or stand at will. R. 28. The ALJ also gave considerable weight to the assessment of state agency physicians, who determined that Plaintiff could perform some chores, prepare some meals, and attend doctor's appointments. R. 29. He discounted the opinions of the physicians who stated that Plaintiff would be off-task for prolonged periods of time and unreliable in attendance. R. 29. As described above, the ALJ's discounting of those opinions was properly reasoned, and there is substantial evidence to support his decision to do so. There is substantial evidence in the record that Plaintiff can perform at the levels described by the ALJ. R. 28-29. Additionally, the ALJ very clearly outlines how he took into account Plaintiff's mental

impairments in his determination of Plaintiff's RFC.  Thus, there is substantial evidence that Plaintiff's RFC was properly calculated, even though the two limitations Plaintiff mentions were not included.  Pl.'s Mem. 9-10.

Plaintiff also contends that when the ALJ posted his hypothetical to the VE, he included a limitation that was not included in Plaintiff's RFC.  Pl.'s Mem. 10.  Plaintiff quotes from the hearing transcript, citing that "the ALJ found the plaintiff to be 'moderately limited in her ability to . . . maintain her concentration, persistence and pace due to her pain and depression and anxiety one-third of the work day . . .'" Pl.'s Mem. 10, (citing R. 59).  However, the full quote from the record clarifies this issue: "I find that she's moderately limited in her ability to . . . maintain her concentration, persistence and pace due to her pain and depression and anxiety one-third of the workday, *and as a result, we need to have* simple, routine, unskilled jobs, SVP: 1 or 2 in nature . . . low stress, low concentration, low memory at this time, and any jobs that are one or two-step tasks . . . ."  R. 59 (emphasis added).  Multiple districts and the Fourth Circuit have found that when an ALJ finds a moderate limitation to concentration, persistence and pace, that limitation can be accounted for in an RFC that limits work to simple, routine, unskilled, and low stress work, as long as the ALJ has properly considered the evidence in the record.  *See Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (finding that a plaintiff's RFC determination to avoid complex tasks was sufficient to address the plaintiff's mental impairments, because the ALJ directly incorporated evidence from the record to support that as the only limitation necessary to accommodate the Plaintiff); *Bantley v. Chater*, (holding that an ALJ's determination that a plaintiff could perform "simple, routine, repetitive tasks, which do not require judgment in ordering the subparts of the job," adequately addressed the ALJ's determination that the plaintiff had "significant deficiencies of pace, concentration, or persistence"); *Rasmussen v. Colvin*, No.

26

5:12cv00059, 2013 WL 5229967, *8-9 (W.D. Va. Sept. 16, 2013) (finding that "substantial evidence supports a limitation to simple, routine tasks, which is sufficient to convey all of" the claimant's limtations, including his moderate difficulties in concentration, persistence and pace, as long as the ALJ "adequately accounted for all impairments reflected in the record"); *Powell v. Astrue*, No. SKG 10-02677, 2013 WL 3776948, *10 (D. Md. July 17, 2013) ("[W]hile the ALJ may not have specifically worded his RFC and hypothetical question to address Mr. Powell's moderate difficulties in concentration, pace, and persistence, his phrasing limiting the claimant to 'unskilled tasks' and jobs that are 'simple' and 'routine in nature' is sufficient to address the limitation.")  As explained above, the ALJ properly examined Plaintiff's medical evidence, and determined that her moderate limitations in concentration, persistence and pace are adequately covered in the RFC by limiting Plaintiff to simple, routine, unskilled jobs of SVP: 1 or 2, which require low stress, low concentration, and low memory.  R. 25, 59.

Finally, Plaintiff's claim that the VE testified that a moderate limitation to concentration, persistence and pace was work-preclusive is untrue.  On cross-examination, Plaintiff's counsel asked the VE how she interpreted the moderate limitation of concentration, persistence and pace, and the VE testified that by looking at the hypothetical as a totality, the moderate limitation "did not prevent [an individual] from doing simple, unskilled work."  R. 61-62.  Plaintiff's attorney then asked how the VE would interpret the requirement of moderate limitation in concentration, persistence and pace if the ability to do simple, unskilled work was removed from the hypothetical. R. 63.  The VE testified that "we don't know, really, what moderate is," but that if Plaintiff's attorney was asking her to interpret a moderate limitation as the inability to maintain attention and concentration for one-third of the workday, then it would be work-preclusive.  R. 63.  The VE then clarified that the ALJ gave a definition of "moderate" in his hypothetical that

was different from Plaintiff's attorney's definition of "moderate," and that the VE's assessment of Plaintiff's RFC was based on the ALJ's definition.  The VE accurately assigned an ability to perform jobs in the national economy pursuant to the ALJ's hypothetical, and the ALJ's hypothetical is supported by substantial evidence in the record.  Plaintiff's attorney's objection is related solely to the question he asked the VE, which changed her interpretation of the word "moderate," and therefore does not apply to the situation at hand.

Additionally, the VE did testify that if an individual misses a significant amount of work, it could be work-preclusive.  R. 65.  Specifically, she testified that normally, "if an individual misses more than 12 to 15 days per year from work, then it would not be consistent with competitive employment."  R. 65.  However, the VE testified to this in response to a question from Plaintiff's attorney regarding frequent absenteeism.  R. 65.  The ALJ did not discuss frequent absenteeism during the hearing.  R. 58-68.  In his opinion, the ALJ discussed no evidence in the record that would indicate that Plaintiff would be absent from work for multiple days.  R. 27-29.  As described above, the ALJ properly discounted the opinions of the physicians, Dr. Kemp and Dr. Lewis, who had indicated she may have long absences.  R. 29.  The ALJ also found Plaintiff's subjective complaints about her condition to be not fully persuasive, citing "numerous inconsistences between the testimony and the evidence of the record," and found that she retained "her ability [to work] despite her impairments to perform work activities with the limitations set forth above."  R. 29.  There is substantial evidence to support this conclusion, given Plaintiff's conservative treatment record, little evidence of physical worsening, and lack of consistent mental health treatment.  R. 28.  Because the ALJ properly discounted the only opinions in the record that indicated that Plaintiff may be prone to prolonged absences, he did not need to account for it in his final RFC calculation.

The decisions of the ALJ are supported by substantial evidence. Because of this, the ALJ's failure to assign specific weight to Dr. Kemp's opinion is harmless error, and his determination of Plaintiff's RFC is correct.

## V. **RECOMMENDATION**

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment and Motion for Remand (ECF Nos. 12 & 13) be DENIED; the Commissioner's Motion for Summary Judgment (ECF No. 15) be GRANTED; the final decision of the Commissioner be AFFIRMED.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v.*

*Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
July 14, 2014